JUDGE ENGELMAYER

14 CV 5437

Michael L. Simes
S. Amy Spencer
McGuireWoods LLP
1345 Avenue of the Americas
New York, New York 10105-0106
Telephone: (212) 548-7013
Facsimile: (212) 715-6260
*Attorney for Plaintiff Trafigura AG*

RECEIVED
JUL 18 2014
U.S.D.C. S.D.N.Y.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

TRAFIGURA AG,
a Delaware Corporation,

        Plaintiff,

        v.

NOBLE AMERICAS CORPORATION,
a Delaware Corporation,

        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**COMPLAINT**

Plaintiff Trafigura AG ("Trafigura"), through its undersigned counsel, for its complaint against Defendant Noble Americas Corporation ("Noble" or "Defendant") alleges as follows:

### I.   NATURE OF THE ACTION

1. In the Fall of 2013, Noble refused to meet its express contractual obligations to Trafigura and—almost immediately thereafter—embarked on a scheme to compound Trafigura's damages through fraud and deceit. This action follows.

2. Pursuant to a valid and enforceable contract (the "Contract," attached hereto as Exhibit A), Trafigura promised to sell to Noble, and Noble promised to buy from Trafigura, a certain quantity and quality of physical gasoline over six separate shipments.

3. In late October 2013, despite having accepted other tenders of gasoline from Trafigura, Noble simply refused to accept or pay for a scheduled delivery of 25,000 barrels of gasoline from Trafigura.

4. Noble's refusal to accept this delivery was a material breach of the Contract.

5. As a consequence of Noble's breach, Trafigura was forced to sell the gasoline to a third party at an amount substantially less than the contract price and was required to re-hedge its gasoline futures position to mitigate the loss.

6. Only weeks later, Noble made intentionally false and misleading statements to induce Trafigura to sell to Noble a gasoline futures contract. Although Trafigura immediately and repeatedly thereafter informed Noble that there had been no valid agreement or justification for the sale, Noble refused to reverse the transaction.

7. As a consequence of Noble's refusal, Trafigura was forced to balance its position by repurchasing the futures at a higher price before they expired, which resulted in losses separate from and in addition to those it suffered through Noble's earlier breach of contract.

8. Accordingly, Trafigura brings this civil action for breach of contract, common-law fraud and fraudulent inducement, commodities fraud, and unjust enrichment against Noble.

## II.  PARTIES

9. Trafigura is a corporation organized under the laws of Switzerland with a registered office in the State of Texas.

10. Noble is a corporation organized under the laws of the State of Delaware with its principal place of business in the State of Connecticut.

### III. JURISDICTION AND VENUE

11. This Court has jurisdiction over the claim arising under 7 U.S.C. §§ 9(1) and 25(a)(1)(D)(i) pursuant to 28 U.S.C. § 1331.

12. This Court has an independent basis for jurisdiction over the remaining claims in this action pursuant to 28 U.S.C. § 1332 because the parties are completely diverse and the amount in controversy exceeds $75,000, exclusive of interest and costs.

13. Venue is proper in this judicial district pursuant to Section 19 of the Contract, wherein Trafigura and Noble jointly agreed to submit to "any federal court of competent jurisdiction situated in the borough of Manhattan, New York."

### IV. STATEMENT OF FACTS

14. The Contract was an installment contract for the sale of goods (here, gasoline); therefore, the Contract and the parties' performance or non-performance thereunder is governed by New York's Uniform Commercial Code (Sales), N.Y. UCC § 2-201 *et seq*.

15. On August 27, 2013, Trafigura's office in Houston, Texas sent to Noble a copy of the Contract, which memorialized Trafigura's promise to sell to Noble, and Noble's promise to buy from Trafigura, a certain quantity and quality of physical gasoline.

16. Noble never objected in writing to the Contract.

17. Under Sections 4 and 5 of the Contract, Trafigura promised to sell to Noble approximately 150,000 barrels of gasoline over the course of six separate cycles (Cycles 55 through 60).

18. Under Section 8 of the Contract, the contract price of each shipment was to be determined by reference to the then-current price of gasoline established by the New York Mercantile Exchange ("NYMEX").

3

19. The gasoline was to be delivered into a pipeline owned by Colonial Pipeline ("Colonial").

20. Colonial had the exclusive authority to dictate which grade of gasoline was to be delivered through its pipeline during any given cycle.

21. In Cycles 55 through 60, Trafigura was to tender either M3- or M4-grade gasoline. In advance of each cycle, Noble was obligated to provide Trafigura with a valid batch number, which Colonial required from Trafigura before it would permit Trafigura's gasoline to be distributed through its pipeline.

22. Noble accepted from and paid Trafigura for gasoline delivered in Cycles 55 through 58.

23. In advance of each cycle, Noble provided Trafigura with a valid batch number prior to shipment.

**A.     Noble breached the Contract by refusing to accept delivery of gasoline.**

24. In or around late October 2013, Colonial changed the designation of Cycle 59 from M3-grade to M4-grade gasoline.

25. Generally speaking, M3-grade gasoline is of higher quality than M4-grade gasoline.

26. At the relevant time, Trafigura had on hand 25,000 barrels of M3-grade gasoline prepared for shipment to Noble, for which the NYMEX-benchmarked contract price was 255.5 cents per gallon.

27. Following Colonial's change in designation, Trafigura received confirmation from Colonial via an email dated October 30, 2013 (the "Colonial email") that M3-grade

4

gasoline could be distributed through a pipeline in which M4-grade gasoline was being pumped. Specifically, Colonial stated Cycle 59 could "move as M3 or M4."

28. On October 31, 2013, Trafigura forwarded the Colonial email to Noble, confirming that the 25,000 barrels of M3-grade gasoline prepared for shipment would be delivered as promised in Cycle 59. Nevertheless, Noble refused to provide Trafigura with a valid batch number, which was necessary for Trafigura to deliver the batch into Cycle 59.

29. As a result of Noble's last-minute and unjustified refusal to accept Trafigura's shipment, Trafigura was forced to sell the 25,000 barrels of M3-grade gasoline to a third party for a flat price of 233.05 cents per gallon—23.45 cents per gallon less than the contract price.

30. Further, Noble had transferred futures to Trafigura before Cycle 59. After Noble breached its contract by refusing Trafigura's shipment, Trafigura was forced to sell these futures on the open market in order to mitigate its damages.

31. As a consequence of Noble's breach, Trafigura realized an actual loss of $246,225.

**B.   Noble induced Trafigura to sell a gasoline futures contract.**

32. In November 2013, Trafigura re-hedged its gasoline position to mitigate further damages caused by Noble's refusal to accept Cycle 59.

33. Via email dated November 11, 2013, Trafigura informed Noble that, among other things, Trafigura had re-hedged its gasoline position for this purpose.

34. Weeks later, Noble contacted Trafigura personnel at Trafigura's office in Montevideo, Uruguay. Noble's agent informed Trafigura that a volume adjustment regarding prior shipments needed to be made and, as a consequence, Trafigura needed to post an exchange-

for-physical ("EFP"). That EFP required Trafigura to sell to Noble a futures contract for 25,000 barrels of gasoline at a price of 255.23 cents per gallon.

35. Specifically, Noble's agent stated to Trafigura: there was an "imbalance" on an "old deal" between Noble and Trafigura; Noble "sold [Trafigura] 150[,000] lots @ 258.00 on 10/8"; "the final [quantity] for that deal was 125[,000 lots]"; and therefore, Noble had to buy from Trafigura "25[,000] lots @ 255.23." These statements were false or misleading.

36. Moreover, by circumventing Trafigura's Houston office (with whom Noble ordinarily dealt and with whom Noble had executed the original Contract) and proceeding directly to Trafigura's Montevideo office, Noble induced Trafigura's Montevideo office—which had no knowledge of Noble's breach relating to Cycle 59—to post the EFP.

37. In fact, Noble knew that Trafigura had already re-hedged its gasoline position after Noble refused to accept delivery of Cycle 59 and, therefore, Trafigura had no need for an additional futures position.

38. Within one day, personnel in Trafigura's Houston-based branch discovered that Noble had induced Trafigura to post the EFP. Trafigura immediately requested that Noble reverse the EFP it had secured from Trafigura's Montevideo-based office.

39. During December 2013, Trafigura negotiated in good faith with Noble for the reversal of that EFP, but Noble refused to do so. Consequently, Trafigura was forced to cover the EFP at 279.96 cents per gallon, which caused Trafigura to realize an actual loss of $259,815.

40. From November 2013 through April 2014, Trafigura made its two separate claims known to Noble and negotiated in good faith to obtain a reasonable settlement on what amounted to, in the aggregate, damages to Trafigura in the amount of $506,040.

6

## COUNT I

### BREACH OF CONTRACT

41. Trafigura incorporates by reference paragraphs 1 through 40 as if fully set forth herein.

42. The Contract was valid and enforceable.

43. Under Sections 4 and 5 of the Contract, Noble was obligated to purchase 25,000 barrels of gasoline from Trafigura, which was to be tendered during Cycle 59.

44. At the time Cycle 59 occurred, the NYMEX-benchmarked contract price was 255.5 cents per gallon.

45. Under Section 20.2(B) of the Contract, a default occurs when "either party fails to perform or repudiates any material obligation to the other party under any contract or other commodity agreement."

46. Noble's refusal to accept delivery of 25,000 barrels of gasoline in Cycle 59 constituted both a failure to perform and a repudiation of a material obligation and, therefore, a material breach under Section 20.2(B) of the Contract.

47. As a consequence of Noble's breach, Trafigura was forced to sell to a third party the 25,000 barrels of gasoline for 232.05 cents per gallon, which was 23.45 cents per gallon less than the contract price.

48. Noble's breach caused Trafigura to sustain $246,225 in actual damages.

## COUNT II

### FRAUD AND FRAUDULENT INDUCEMENT

49. Trafigura incorporates by reference paragraphs 1 through 48 as if fully set forth herein.

7

50. As discussed in Paragraphs 33-38, Noble made a statement of material fact to Trafigura's Montevideo office regarding an "imbalance" that required Trafigura to sell a futures contract to Noble.

51. Noble's statements were untrue or misleading when made.

52. Noble acted with the intent to deceive by circumventing Trafigura's Houston office and, despite knowing that Trafigura did not need to further hedge against its earlier loss caused by Noble's breach of contract, by making untrue or misleading statements regarding the "imbalance."

53. Trafigura justifiably relied on Noble's statements and actions by selling to Noble a futures contract and posting an EFP for 25,000 barrels at 255.23 cents per gallon, a sub market price.

54. Following the sale, Trafigura was later forced to cover that EFP at a higher price of 279.96 cents per gallon.

55. As a result of that transaction, which would never have occurred without Noble's fraudulent statements, Trafigura sustained an additional $259,815 in actual damages.

## COUNT III

### COMMODITIES FRAUD
### (7 U.S.C. §§ 9(1) and 25(a)(1)(D)(i))

56. Trafigura incorporates by reference paragraphs 1 through 55 as if fully set forth herein.

57. The Commodities Exchange Act ("CEA"), 7 U.S.C. § 9(1) states, in relevant part:

It shall be unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such

rules and regulations as the Commission shall promulgate by not later than 1 year after July 21, 2010.

58.     The CEA, 7 U.S.C. § 25(a)(1)(D)(i), further provides, in relevant part:

Any person . . . who . . . willfully . . . counsels, induces, or procures the commission of a violation of this chapter shall be liable for actual damages resulting from one or more of the transactions referred to [below] . . . and caused by such violation to any other person – . . . (D) who purchased or sold a contract [of sale of any commodity for future delivery] if the violation constitutes -- . . . (i) the use or employment of, or an attempt to use or employ, in connection with a swap, or a contract of sale of a commodity, in interstate commerce, . . . any manipulative device or contrivance in contravention of such rules and regulations as the [Commodity Futures Trading Commission ("CFTC")] shall promulgate by not later than 1 year after July 21, 2010.

59.     The CFTC, in turn, promulgated the following rule on July 14, 2011:

It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly: (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud; (2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; [or] (3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person. 17 C.F.R. § 180.1(a)(1)-(3).

60.     As discussed in Paragraphs 33-38, Noble made untrue or misleading statements to Trafigura's Montevideo office regarding an "imbalance" that required Trafigura to sell a futures contract to Noble.

61.     By making these statements and by circumventing Trafigura's Houston office, Noble employed a manipulative scheme or engaged acts that operated as a fraud upon Trafigura.

62.     Noble's statements and actions caused or induced Trafigura to sell to Noble a futures contract by posting an EFP for 25,000 barrels at 255.23 cents per gallon, a sub market price.

63.     Following that sale, Trafigura was later forced to cover that EFP at a higher price of 279.96 cents per gallon.

64. As a result of that cover, Trafigura sustained $259,815 in actual damages.

65. Under 7 U.S.C. § 25(a)(3)(B), double damages are available for "willful and intentional" violations of the CEA.

66. By making the foregoing untrue or misleading statements and by circumventing Trafigura's Houston office, Noble's violation was "willful and intentional".

67. Therefore, Trafigura is entitled to double damages in the amount of $519,630.

## COUNT IV

### UNJUST ENRICHMENT

68. Trafigura incorporates by reference paragraphs 1 through 67 as if fully set forth herein.

69. By selling to Noble a futures contract and via posting an EFP for 25,000 barrels at a sub market price (255.23 cents per gallon), Trafigura conferred a benefit upon Noble.

70. Because Trafigura later covered that EFP at a higher price (279.96 cents per gallon), the earlier benefit Trafigura conferred upon Noble was made at Trafigura's expense.

71. In light of Noble's misleading and untrue statements, its circumvention of Trafigura's Houston office, and its knowledge that Trafigura had already hedged against its losses sustained by Noble's earlier breach of contract, it would be inequitable and against good conscience to permit Noble to retain the benefit Trafigura conferred upon it.

72. Therefore, Trafigura is entitled to the profits and other pecuniary benefits Noble received as a result of Trafigura's posting the EFP.

\* \* \* \*

**WHEREFORE**, Trafigura respectfully prays that this Court enter judgment in favor of Trafigura and against Noble as follows:

a)    For contract damages in the amount of $246,225; and

b)    For fraud or fraudulent-inducement damages in the amount of $259,815; or

c)    For commodities-fraud damages in the amount of $519,630; or

d)    For unjust-enrichment damages in an amount to be determined; and

e)    For costs, expenses and disbursements incurred by Trafigura in bringing and maintaining this action, including reasonable attorneys' fees; and

f)    For such other and further relief as this Court may deem just and proper.

Dated: New York, New York
       July 18, 2014

Respectfully submitted,

_____
Michael L. Simes
S. Amy Spencer
MCGUIREWOODS LLP
1345 Avenue of the Americas - 7th Floor
New York, New York 10105-0106
Telephone: 212-548-7013
Facsimile: 212-715-6260
*Attorney for Plaintiff, Trafigura AG*